Frank D. Garrison, Ind. Bar No. 34024-49*
Paige E. Gilliard, Cal. Bar No. 330051*
Sam Rutzick, DC Bar No. 90030322*
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
FGarrison@pacificlegal.org
PGilliard@pacificlegal.org
SRutzick@pacificlegal.org

Mark Miller, Fla. Bar No. 0094961*
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
Telephone: (561) 691-5000
Mark@pacificlegal.org
        *Pro Hac Vice
*Attorneys for Plaintiffs Alaska Forest Association,*
*Viking Lumber, and Alcan Timber*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA FOREST ASSOCIATION; VIKING LUMBER COMPANY; and ALCAN TIMBER INCORPORATED, | Case No. 3:25-cv-00046-SLG |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as the Secretary of Agriculture; U.S. FOREST SERVICE; and TOM SCHULTZ, in his official capacity as Chief of the U.S. Forest Service, | |
| Defendants, | |

ORGANIZED VILLAGE OF
KASAAN; ORGANIZED VILLAGE
OF KAKE; THE BOAT COMPANY;
ALASKA LONGLINE FISHERMEN'S
ASSOCIATION; NATURAL
RESOURCES DEFENSE COUNCIL;
SOUTHEAST ALASKA
CONSERVATION COUNCIL; THE
WILDERNESS SOCIETY; and
CENTER FOR BIOLOGICAL
DIVERSITY,

      Proposed Defendant-Intervenors.

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION .................................................................................1

LEGAL AND FACTUAL BACKGROUND ........................................5

    A.   National Forest Management Act ........................................5

    B.   ANILCA and the Tongass Timber Reform Act ...................6

    C.   Factual Background .............................................................8

ARGUMENT .................................................................................... 14

    I.   Plaintiffs Have Plausibly Alleged that Defendants Violated the APA by Failing to Take Mandatory Actions Under the Tongass Timber Reform Act ............................................................................... 14

    A.   The TTRA creates a mandatory, non-discretionary duty for the Defendants to seek to provide a supply of timber from the Tongass National Forest that meets market demands ................................... 14

    B.   Defendants have failed to act on their statutory duty under the TTRA by refusing to seek to provide the market demand for timber from the Tongass National Forest ...................................... 18

    C.   Defendants' motion to dismiss misconstrues Plaintiffs' Complaint, the TTRA, and this Court's precedent ................................ 21

    II.   Plaintiffs Have Plausibly Alleged That Defendants Violated the APA by Failing to Take Mandatory Actions Under the 2016 Management Plan ................................................................................ 24

    III.   Plaintiffs Have Plausibly Alleged That Defendants Violated the APA by Foreclosing Sales of Old-Growth Timber Under the Tongass Timber Reform Act ...................................................... 29

CONCLUSION ................................................................................ 31

CERTIFICATE OF COMPLIANCE ................................................ 31

# TABLE OF AUTHORITIES

## Cases

*Al Otro Lado v. Executive Off. for Immigr. Review,*
138 F.4th 1102 (9th Cir. 2025) ............................................................. 15, 21

*American Forest Resource Council v. United States,*
77 F.4th 787 (D.C. Cir. 2023) ............................................................. 23–24

*Azar v. Allina Health Servs.,*
587 U.S. 566 (2019) ............................................................................. 20

*City of Arlington v. FCC,*
569 U.S. 290 (2013) ............................................................................. 29

*Clinton v. City of New York,*
524 U.S. 417 (1998) ............................................................................. 29

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
591 U.S. 1 (2020) ................................................................................. 27

*FCC v. Fox TV Stations, Inc.,*
556 U.S. 502 (2009) ............................................................................. 27

*Forest Guardians v. Babbitt,*
174 F.3d 1178 (10th Cir. 1999) ............................................................. 15

*Hoonah Indian Ass'n v. Morrison,*
170 F.3d 1223 (9th Cir. 1999) ........................................................... 8, 17

*Kentucky v. EPA,*
123 F.4th 447 (6th Cir. 2024) ............................................................... 28

*La. Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986) ............................................................................. 29

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
523 U.S. 26 (1998) ............................................................................... 15

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ........................................................................ 14, 16

*Lujan v. Nat'l Wildlife Fed'n,*
497 U.S. 871 (1990) ............................................................................. 23

*Murphy v. Smith,*
583 U.S. 220 (2018) ......................................................................... 15–16

*Native Ecosystems Council v. Dombeck,*
  304 F.3d 886 (9th Cir. 2002)......................................................... 6, 20

*Natural Res. Def. Council v. U.S. Forest Serv.,*
  421 F.3d 797 (9th Cir. 2005)......................................................... 8, 17

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
  137 F.3d 1372 (9th Cir. 1998).............................................................6

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004) ............................................... 14, 17, 23, 25–26

*Or. Nat. Desert Ass'n v. Bushue,*
  644 F. Supp. 3d 813 (D. Or. 2022) ............................................. 26

*Sierra Club v. Whitman,*
  268 F.3d 898 (9th Cir. 2001) ....................................................... 15

*Stout v. U.S. Forest Serv.,*
  869 F. Supp. 2d 1271 (D. Or. 2012)............................................. 27

*United States v. Monsanto,*
  491 U.S. 600 (1989) .................................................................... 15

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) .................................................................... 30

*Vietnam Veterans of Am. v. CIA,*
  811 F.3d 1068 (9th Cir. 2016)..................................................... 27

*West Virginia v. EPA,*
  597 U.S. 697 (2022) .............................................................. 29–30

### Statutes

5 U.S.C. § 706(1) ...................................... 14–15, 18, 22–23, 25, 27

5 U.S.C § 706(2) ....................................................................... 25, 28

16 U.S.C. § 539d(a) ............................................................ 1, 7, 24

16 U.S.C. § 1600 *et seq.* ................................................................5

16 U.S.C. § 1604(a) .......................................................................5

16 U.S.C. § 1604(d)(1) ..................................................................5

16 U.S.C. § 1604(f) ..................................................................... 20

16 U.S.C. § 1604(f)(4) ...................................................................6

16 U.S.C. § 1604(i) .......................................................................5

*Alaska Forest Ass'n v. USDA*          iii
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG    Document 31    Filed 06/24/25    Page 5 of 37

16 U.S.C. § 3101 *et seq* ..................................................................6

16 U.S.C. § 3101(d) ...................................................................... 17

Pub. L. No. 96-587, 94 Stat. 3387 (1980) .......................................6

## Regulations

36 C.F.R. § 219.4 ...........................................................................5

36 C.F.R. § 219.6 ...........................................................................5

36 C.F.R. § 219.7 ...........................................................................5

36 C.F.R. § 219.13 .........................................................................5

## Other Authorities

81 Fed. Reg. 88,657 (Dec. 8, 2016) ...............................................9

88 Fed. Reg. 88,042 (Dec. 20, 2023) ........................................... 21

Drais, Daniel G., *The Tongass Timber Reform Act: Restoring Rationality and Responsibility to the Management of America's Largest National Forest*, 8 Va. Envtl. L.J. 317 (1989) ..................................7

H.R. Rep. No. 600, 100th Cong., 2d Sess. 4 (1988) ...........................................7

Letter from John Boozman, Ranking Member, Senate Comm. on Agric., Nutrition, and Forestry, et al. to Thomas J. Vilsack, Sec'y, USDA (Mar. 20, 2024), https://agriculture.house.gov/uploadedfiles/letter_old.gro wth.forest.plan.amendment_03.20.2024.pdf ............................................. 30

U.S. Forest Serv., *Draft Timber Resources Assessment Tongass National Forest Plan Revision* (Dec. 2024).................................. 12

U.S. Forest Serv. Memo to Deputy Chiefs, et al. (Jan. 7, 2025), https://forestresources.org/wp-content/uploads/2025/01/national-old-growth-amendment-draft-eis-withdrawal-memo-1-7-25.pdf .............. 21

U.S. Forest Serv., *Tongass Land and Resource Management Plan Final Environmental Impact Statement Plan Amendment* (Dec. 2016) .................9

USDA, Forest Products, https://research.fs.usda.gov/forestproducts (last visited June 24, 2025) ........................................................ 30

## INTRODUCTION

For over a century, the timber industry has helped sustain Southeast Alaska's communities—providing jobs, economic stability, and a way of life for thousands of families. Congress recognized the industry's vital role when it enacted the Tongass Timber Reform Act (TTRA) in 1990, carefully balancing the need for natural resource stability with the economic needs of Alaska's rural communities. To ensure those economic needs are met, Congress mandated that the Secretary of Agriculture must "seek to provide a supply of timber from the Tongass National Forest which (1) meets the annual market demand for timber from such forest and (2) meets the market demand from such forest for each planning cycle." 16 U.S.C. § 539d(a). This mandate is not a hortatory goal for the executive branch to aspire to through unlimited discretion—it is a statutory duty.

Yet today, Southeast Alaska's timber industry teeters on the brink of collapse because of the executive branch's refusal to comply with the TTRA. Employment has plummeted by 91%—from 3,500 jobs in 1991 to just 300 today. Small businesses have shuttered; families have been forced to leave communities their ancestors helped build; and vital natural resources required for human flourishing never come to market. This devastation did not result from market forces or environmental necessity. It resulted from Defendants' deliberate decision to abandon their legal obligations under federal law.

To be sure, the Secretary, acting through the U.S. Forest Service, ostensibly sought to fulfill her statutory duty through a Forest Management Plan promulgated in 2016. That plan was developed through years of public participation and environmental review—and outlined specific timber volumes that would seek to satisfy market demand for timber. These were not mere aspirational goals but careful calculations that industry relied on for business planning, capital investments, and employment decisions. Yet Defendants have brazenly ignored the 2016 Management Plan (and thus the TTRA) by refusing to offer any meaningful sales of timber.

Worse still, Defendants accomplished this illegal moratorium not through proper rulemaking procedures but through guidance—the so-called "Southeast Alaska Sustainability Strategy"—that unilaterally declared an end to "large-scale old growth timber sales." No environmental impact statement. No official public comment offered to those affected by the strategy. No consideration of the devastating effects on timber-dependent small businesses and communities—just a bureaucratic fiat that flouted statutory and regulatory requirements.

Defendants now ask this Court to bless their lawless actions by dismissing this case. They claim that their statutory duties are purely discretionary, their plan commitments are unenforceable, and their policy reversals are unreviewable. But accepting these arguments would render the TTRA

*Alaska Forest Ass'n v. USDA*                    2
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG    Document 31    Filed 06/24/25    Page 8 of 37

meaningless, make forest planning a charade, and leave the Administrative Procedure Act's (APA's) protections against arbitrary agency action toothless. It would also tell the small businesses and families of Southeast Alaska that federal statutory commitments are worthless, that their reliance interests mean nothing, and that agencies can destroy entire industries on a whim.

The Court should reject this request. First, Plaintiffs have plausibly alleged that Defendants have failed to act on their mandatory duty under the TTRA to seek to provide timber that meets market demand. Despite the Ninth Circuit holding that the TTRA's "seek to provide" language creates a judicially enforceable duty—not mere aspirations that the executive branch can decline to enforce—Defendants abandoned any good-faith effort to comply with this statutory mandate and explicitly repudiated any obligation to do so.

Second, Defendants ignored the 2016 Management Plan that outlines the market demand and timber volumes that would satisfy that demand. Under the National Forest Management Act, forest management plans create mandatory constraints that agencies must follow. The Management Plan's objectives are an enforceable commitment on which Plaintiffs reasonably relied. The APA requires agencies to consider and accommodate reliance interests when changing policy. Here, Defendants are systematically destroying an entire industry without considering the devastating impacts on

*Alaska Forest Ass'n v. USDA*                    3
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG    Document 31    Filed 06/24/25    Page 9 of 37

businesses, workers, and communities that organize their existence around timber.

Third, the Southeast Alaska Sustainability Strategy illegally amended the 2016 Management Plan without required procedures. Agencies cannot evade proper rulemaking procedures by labeling drastic substantive changes as "strategies" or "guidance." By eliminating old-growth sales through what amounts to a press release, Defendants violated fundamental principles of administrative law.

Finally, Defendants exceeded their statutory authority under the major questions doctrine. Defendants actions have threatened to eliminate a century-old industry in Southeast Alaska—an industry that Congress has sought to protect through legislation—without a clear statement from Congress. No such clear statement exists in federal law.

* * * * *

Decades of federal overreach and broken commitments, exemplified by the unilateral abandonment of the 2016 Management Plan have collapsed Southeast Alaska's timber sector. Plaintiffs' Alaska Forest Association (AFA), Viking Lumber Company (Viking), and Alcan Timber (Alacan) sue to hold Defendants accountable, seeking only that the Court compel the Defendants to honor their statutory obligations under the TTRA and the 2016 Management Plan—obligations vital to an industry now facing extinction.

*Alaska Forest Ass'n v. USDA*     4
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG     Document 31     Filed 06/24/25     Page 10 of 37

## LEGAL AND FACTUAL BACKGROUND

### A. National Forest Management Act

The National Forest Management Act of 1976 (NFMA) provides the overarching framework for forest planning and management. 16 U.S.C. § 1600 *et seq*. Under the statute, the Secretary of Agriculture must "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System[.]" *Id*. § 1604(a). These plans are not mere policy guidelines—they are the means of implementing binding obligations over forest management.

The Secretary, through the Forest Service, fulfills this mandate by establishing management plans under a structured approach requiring public participation. *Id*. § 1604(d)(1). The process starts with an assessment of ecological and economic conditions, followed by drafting a plan or amendment with components like objectives and standards as mandated by the statute. 36 C.F.R. § 219.6; *id*. § 219.7. Public participation is central, with requirements to ensure opportunities are provided for the public to comment. *Id*. § 219.4. After approving a plan or amendment, the Forest Service must continue to monitor the plan and amend it as necessary. *Id*. § 219.13. This process ensures compliance with the NFMA.

The NFMA also mandates that forest management activities "shall be consistent with the land management plan," 16 U.S.C. § 1604(i), and

*Alaska Forest Ass'n v. USDA*     5
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG     Document 31     Filed 06/24/25     Page 11 of 37

constrains the executive branch's management of forest resources. *See Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1378 (9th Cir. 1998) (finding Forest Service violated the NFMA by acting inconsistently with a management plan). If the Secretary wants to deviate from a management plan, the proper procedure is through an amendment to the plan. 16 U.S.C. § 1604(f)(4). Thie amendment process requires compliance with the public participation procedures under § 1604(d) when it results in a "significant change" to the plan. These constraints are judicially enforceable through the APA. *See, e.g.*, *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 898 (9th Cir. 2002).

### B. ANILCA and the Tongass Timber Reform Act

Congress enacted the Alaska National Interest Lands Conservation Act (ANILCA) in 1980. 16 U.S.C. § 3101 *et seq*. ANILCA emerged from a hard-fought compromise between Alaskans and conservationists, balancing the state's natural beauty with the economic vitality of its natural resources industry. Congress, under Section 705(a), thus directed the Secretary of the Treasury to provide the Secretary of Agriculture with significant resources to sustain a timber supply from the Tongass National Forest. This supply would provide "four billion five hundred million board feet" of timber each decade. Pub. L. No. 96-587, § 705(a), 94 Stat. 3387 (1980). This commitment firmly preserved the Alaskan timber industry as a cornerstone of the state's economy.

*Alaska Forest Ass'n v. USDA*     6
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG     Document 31     Filed 06/24/25     Page 12 of 37

But Congress became concerned that ANILCA failed to adequately protect the Tongass National Forest or adequately support its timber industry, so in 1990 it amended ANILCA through the TTRA. At that time, the Forest Service viewed ANILCA's 4.5 billion board feet provision as an inflexible mandate that disregarded actual annual market demand, resulting in mismanagement of Tongass timber resources. Over time, the Forest Service adjusted its interpretation to align the 4.5 billion board feet requirement with actual market demand, a practice Congress codified in the TTRA to ensure a sustainable timber supply.[1]

To implement that assurance, the TTRA requires the "satisfaction of certain market demands." 16 U.S.C. § 539d(a). Under this requirement, the Secretary, in compliance with the "requirements of the National Forest Management Act," must,

> consistent with providing for the multiple use and sustained yield of all renewable forest resources, seek to provide a supply of timber from the Tongass National Forest that (1) meets the annual market demand for timber from such forest and (2) meets the market demand from such forest for each planning cycle.

*Id.*

---

[1] "Congress intended … not to reduce the amount of timber available to the industry, and that was expressly stated a number of times." Daniel G. Drais, *The Tongass Timber Reform Act: Restoring Rationality and Responsibility to the Management of America's Largest National Forest*, 8 Va. Envtl. L.J. 317, 324 (1989) (citing H.R. Rep. No. 600, 100th Cong., 2d Sess. 4 (1988)).

Thus, rather than require a strict target as in ANILCA, Congress required the Secretary to seek to meet the market demand for timber.

As the Ninth Circuit has explained, the TTRA's market demand requirement is not a mere delegation of discretion to the executive branch for it to regulate the Tongass National Forest as it sees fit. Rather, it "commands the Secretary of Agriculture to sell enough wood from the Tongass National Forest ... to satisfy market demand." *Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223, 1225 (9th Cir. 1999). In this way, it "impose[s] a unique duty on the Forest Service to consider the 'market demand' for timber." *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 801 (9th Cir. 2005). And this "required duty, to assess market demand for timber, can be seen as a refinement of the general requirement under NFMA that the forest service consider timber harvest as one of the goals to be balanced with environmental preservation and recreational use." *Id.* at 801 n.7.

**C. Factual Background**

*The 2013 Memo*. In 2013, then-Secretary of Agriculture Vilsack issued Memorandum 1044-009 ("Vilsack Memo"), directing the Forest Service to assess the need for amending the 2008 Tongass Management Plan to transition the Tongass National Forest to a young-growth-based timber program over the next 10–15 years. ECF No. 15-2, ROD at 12. The transition,

*Alaska Forest Ass'n v. USDA*                                    8
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG    Document 31    Filed 06/24/25    Page 14 of 37

a high priority for the Secretary and Forest Service, was to be implemented over a lengthy timeline to preserve a viable timber industry and jobs in Southeast Alaska. *Id.* Accordingly, the Secretary stipulated that the Forest Service would "continue to offer a supply of old growth timber while increasing the supply of young growth to provide industry in Alaska the opportunity to develop new markets, learn new skills, and acquire new equipment." *See* U.S. Forest Serv., *Tongass Land and Resource Management Plan Final Environmental Impact Statement Plan Amendment* 3–4 (Dec. 2016).

*The 2016 Management Plan and Record of Decision.* In 2016, the Forest Service took the guidance from the Vilsack Memo and issued proposed amendments to the Tongass Land and Resource Management Plan, ECF No. 15-2, ROD at 5, and the final Record of Decision was published in December 2016. *See* 81 Fed. Reg. 88,657 (Dec. 8, 2016). Relevant here, as outlined in the ROD, the 2016 Management Plan adopted two timber objectives:

> **O-TIM-01**: Seeking to accelerate a transition to primarily young-growth harvest, offer an average of 46 MMBF annually in a combination of old growth and young growth. When young-growth offered is less than 41 MMBF, provide old growth to make up the difference and achieve the average annual projected timber sale quantity of 46 MMBF. After the transition, offer an average of 5 MMBF of old growth annually to support Southeast Alaska mills.

> **O-TIM-02**: Seek to provide an economic timber supply sufficient to meet the annual market demand for Tongass National Forest timber, and the market demand for the planning cycle. The volume

*Alaska Forest Ass'n v. USDA*                          9
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG    Document 31    Filed 06/24/25    Page 15 of 37

of young growth as part of the yearly offer will increase from an average of 9.2 MMBF annually in the first decade to an average of 25 MMBF annually in years 11-15 as the program nears full transition.

ECF No. 15-1 at 270–71.

The two timber objectives were complemented by an additional two young-growth objectives that provide:

> **O-YG-01**: During the 15 years after plan approval, the amount of young-growth offered would gradually increase to exceed 50 percent of the timber offered annually.

> **O-YG-02**: During the 15 years after plan approval, offer increasing annual volumes of economically viable young-growth timber. Old-growth timber harvest would gradually be reduced to an average of 5 million board feet (MMBF) annually, to support Southeast Alaska mills.

ECF No. 15-1 at 259–60.

Thus the 2016 Management Plan outlined a timber market demand of 46 MMBF annually (36.8 MMBF old-growth, 9.2 MMBF young-growth in years 1–10), shifting to mostly young-growth in years 11–15. ECF No. 15-2, ROD at 12 (stating the purpose of the amendment is to give the industry a 10–15-year period to adapt).

As the Secretary explicitly explained in the ROD, these market demand conclusions are "conservative and rational" and serve to "maintain[] a viable timber industry" while a transition to young growth timber takes place. *Id.* at

*Alaska Forest Ass'n v. USDA*                    10
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG    Document 31    Filed 06/24/25    Page 16 of 37

29. Importantly, these objectives also were what the Secretary considered necessary to be an appropriate volume of timber that "seeks to meet market demand, consistent with TTRA." *Id.* at 30.

*Southeast Alaska Sustainability Strategy.* After the ROD was final, but falling short of the timber market demand they set out in the 2016 Management Plan, Defendants provided around 31 MMBF. But after 2017, Defendants offered less than 10 MMBF annually on average from 2018 through 2021. ECF No. 1 ¶ 25. Then in July 2021, then-Secretary Vilsack announced the "Southeast Alaska Sustainability Strategy," which pledged that "[a]s a key part of [the Strategy], USDA will end large-scale old growth timber sales on the Tongass National Forest." *Id.* ¶ 27. The policy shift abandoned the 2016 Management Plan's timber harvest market demand analysis and halted NEPA reviews for any new sales and thus assured any new sales would be paused for years or never come about at all. ECF No. 1-2 ¶ 9.

*Alaska Forest Ass'n v. USDA*     11
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG     Document 31     Filed 06/24/25     Page 17 of 37



U.S. Forest Serv., *Draft Timber Resources Assessment Tongass National Forest Plan Revision* 11, 13 (Dec. 2024).

*Plaintiffs' injuries.* AFA, Viking, and Alcan suffered and continue to suffer severe economic harm because of Defendants' failure to provide or even seek to provide timber sales as mandated by the TTRA and the 2016 Management Plan. This has led to a critical timber supply shortage, threatening the survival of their businesses and the livelihoods of their employees in Southeast Alaska. ECF No. 1 ¶¶ 30–33.

*Alaska Forest Association.* The AFA is a trade organization representing Southeast Alaska's timber industry. It is now facing severe economic harm as its member businesses, including logging companies, sawmills, and truckers, risk collapse due to the USDA and Forest Service's failure to abide by the TTRA

*Alaska Forest Ass'n v. USDA*      12
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG     Document 31     Filed 06/24/25     Page 18 of 37

and 2016 Management Plan. ECF No. 1 ¶¶ 7, 30. AFA's members relied on the 2016 Management Plan and assurances from the Forest Service for business planning, and the lack of timber supply threatens the viability of the region's timber communities. *Id.* ¶ 48.

*Viking Lumber Company.* A family-owned sawmill, supporting 48 full-time employees and 140 additional jobs, is on the brink of shutting down due to insufficient timber sales from the Tongass National Forest. ECF No. 1-1 ¶¶ 8, 13–14. Viking faces the loss of a $20 million mill if the Defendants continue to not abide by the TTRA and 2016 Management Plan. *Id.*

*Alcan Timber.* Alcan Timber supports over 60 jobs in Alaska through logging and related operations. It cannot continue its business without timber sales from the Tongass, as it owns no timber lands and depends entirely on federal sales. ECF No. 1-2 ¶¶ 4–6, 12. The Forest Service's failure to meet market demand or even seek to meet market demand under the TTRA jeopardizes Alcan's operations and the livelihoods of its contractors. *Id.* ¶ 12.

For Plaintiffs and their members and employees, the issues raised here represent not just economic loss but an existential threat. These are not large corporations with diversified holdings that can weather illegal policy changes. They are small, family-owned businesses with deep roots in Southeast Alaska

that use specialized equipment that cannot be easily repurposed and employ skilled workforces that cannot simply transition to other industries. When Defendants violated their legal obligations, they set in motion the destruction of an entire economic sector and the communities it sustains.

## ARGUMENT

I. **Plaintiffs Have Plausibly Alleged that Defendants Violated the APA by Failing to Take Mandatory Actions Under the Tongass Timber Reform Act.**

A. **The TTRA creates a mandatory, non-discretionary duty for the Defendants to seek to provide a supply of timber from the Tongass National Forest that meets market demands.**

Under the APA, courts must "exercise independent judgment in construing statutes administered by agencies" and "in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 406, 412 (2024). This requires the use of "all relevant interpretive tools" to determine the "best" reading of a statute. *Id.* at 400. In turn, the APA empowers courts to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1). This provision applies when an agency fails to take "*discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). The fundamental principle underlying § 706(1) is that agencies must follow congressional commands and exercise the mandatory statutory duties Congress places on those agencies. *See*

*Alaska Forest Ass'n v. USDA*                    14
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG    Document 31    Filed 06/24/25    Page 20 of 37

*Al Otro Lado v. Executive Off. for Immigr. Review*, 138 F.4th 1102, 1120 (9th Cir. 2025) (holding that an agency violated APA 706(1) by failing to exercise mandatory statutory duties). The TTRA's text, statutory context, and precedent—including Ninth Circuit precedent—places a mandatory statutory duty on the Defendants to seek to ensure that market demand for timber from the Tongass is met—which includes seeking to provide old-growth timber if it is part of market demand.

Start "with the specific statutory language in dispute." *Murphy v. Smith*, 583 U.S. 220, 223 (2018). First, the statute's text commands that Defendants "shall" seek to provide timber that meets market demand. And "the word 'shall' usually creates a mandate, not a liberty." *Id.*; *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (shall "normally creates an obligation impervious to judicial discretion"); *Sierra Club v. Whitman*, 268 F.3d 898, 904 (9th Cir. 2001) ("'shall' in a statute generally denotes a mandatory duty"). *See also Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999) ("The Supreme Court ... [has] made clear that when a statute uses the word 'shall,' Congress has imposed a mandatory duty upon the subject of the command.") (citing *United States v. Monsanto*, 491 U.S. 600, 607 (1989)).

Second, the verb phrase "shall … seek to provide" includes the infinitival phrase "to provide," which specifies the purpose of the nondiscretionary duty—to supply timber that meets both annual and planning-cycle market demand. *See Murphy*, 583 U.S. at 223 (finding the infinitival phrase "to satisfy" "specifies the purpose or aim of the verb's nondiscretionary duty"). Here, "seek to provide" similarly directs the Defendants to take affirmative steps and seek to achieve the statute's demand that market demand for timber is provided.

Finally, Congress's choice to use "shall" and "seek to provide" over discretionary language like "may" underscores the mandatory nature of the duty. *Id.* at 223–24. "[R]espect for Congress's prerogatives as policymaker means carefully attending to the words it chose rather than replacing them with others of our own." *Id.* at 224. To interpret "shall … seek to provide" as wholly discretionary as asserted by Defendants would cede to the Defendants interpretative authority that Congress did not grant them, a result courts must avoid when resolving questions of statutory interpretation. *See Loper Bright Enters.*, 603 U.S. at 392 (holding that courts, not agencies, decide all questions of law, including statutory meaning).

Statutory context affirms what the text mandates. Indeed, Congress enacted the TTRA to remove fixed harvest targets and instead tie timber

supply to market demand. But Congress did not alter one of the primary purposes of ANILCA—to "provide[] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." 16 U.S.C. § 3101(d). Thus, Congress enacted the TTRA not to delegate broad discretion to Defendants to create the best policy for timber supply as it deems fit, but as a requirement to affirmatively calibrate supply to actual economic need.

The Ninth Circuit's precedent confirms what the statute's text and context provide. Indeed, the Ninth Circuit found that the text "commands the Secretary of Agriculture to sell enough wood from the Tongass National Forest ... to satisfy market demand." *Hoonah Indian Ass'n*, 170 F.3d at 1225. And the text places a "unique duty" on her to seek to meet "the 'market demand' for timber." *Natural Res. Def. Council*, 421 F.3d at 801.

Thus, the TTRA places an affirmative mandatory duty on the Defendants to take a "required" agency action: To seek to provide timber from the Tongass National Forest that meets market demands. *Norton*, 542 U.S. at 63. To be sure, Defendants have flexibility in how to carry out that agency action, but it does not change the statute's mandate that they seek to provide an amount of timber that meets market demand. *Natural Res. Def. Council*, 421 F.3d at 809 (To "satisfy the TTRA's earnest admonishment requires the Forest Service to at least *consider* market demand and *seek* to meet market demand.).

*Alaska Forest Ass'n v. USDA*          17
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG     Document 31     Filed 06/24/25     Page 23 of 37

**B. Defendants have failed to act on their statutory duty under the TTRA by refusing to seek to provide the market demand for timber from the Tongass National Forest.**

Accepting Plaintiffs' allegations as true, the Defendants' refusal to implement—its refusal to take a discrete action—to seek to supply the market demand for timber from the Tongass violates the TTRA's clear mandate. This inaction states a plausible claim under APA § 706(1).

Under the TTRA, Defendants are required to seek to supply the market demand for timber. This requirement is implemented through management plans under the NFMA. In promulgating the 2016 Management Plan, Defendants evaluated five potential alternatives for timber objectives in detail, dismissing others as incompatible with the amendment's purpose. ECF No. 15-2, ROD at 11–12. As the ROD concluded, an immediate end to providing old-growth timber was not analyzed in depth, because it would fail to support a viable timber industry and jobs for Southeast Alaska residents. *Id.* But the Defendants also refused to accept the alternative to phase out of providing old-growth timber within five years because it was too rapid, conflicted with the Vilsack Memo's 10–15-year transition period, and would not sustain the industry because of the lack of market demand for young-growth timber. *Id.* More directly, the ROD stated that a phase down of offering old-growth timber

*Alaska Forest Ass'n v. USDA*        18
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG     Document 31     Filed 06/24/25     Page 24 of 37

would not be viable because "the market for large volumes of young-growth logs has not yet been demonstrated" and would be "insufficient" to produce even 31.5 MMBF annually by the end of year 5. *Id.* at 12. Put differently, phasing out old-growth timber within 5 years would not comply with the Defendants' duty to "provide" market demand for timber.

The ROD then explained that it accepted "Alternative 5"—a 15-year phase out of providing old-growth timber, ECF No. 15-2, ROD at 36—because the timber supply objectives are "conservative and rational" and serve to "maintain a viable timber industry" while a transition to young growth timber takes place. *Id.* at 29–30. Importantly, these objectives also were what the Secretary considered necessary to be an appropriate volume of timber that "seeks to meet market demand, consistent with TTRA." *Id.* at 30.

As Plaintiffs have alleged, Defendants never sought to provide what it found to be the "market demand" for timber. For the first year after the ROD was final, Defendants offered 31 MMBF. But after 2017, timber sales plummeted with Defendants selling less than 10 MMBF annually on average from 2018 through 2021. ECF No. 1 ¶ 25.

Then came the "Southeast Alaska Sustainability Strategy." With that press release, Defendants explicitly phased out old-growth timber sales almost if not completely after five years. This was an illegal amendment to the 2016

Management Plan and thus violated the TTRA, NFMA, and APA. *See* 16 U.S.C. § 1604(f); *Dombeck*, 304 F.3d at 897 ("Activities ... must be determined to be consistent with the governing forest plan.").

This "press release"[2] disclaiming the Defendants' intention to abide by the old-growth market calculations worked a significant change in the management plan and foreclosed any chance of supplying the market demand for timber from the Tongass. Indeed, as Defendants exclaimed: "As a key part of [the Strategy], USDA will end large-scale old growth timber sales on the Tongass National Forest." ECF No. 1 ¶ 27 (citation omitted). It also halted any NEPA analyses—a prerequisite for supplying timber—for any new sales of old growth timber and thus ensured that the market demand, as outlined in the 2016 Management Plan, would never come to fruition. ECF No. 1-2 ¶ 9. Indeed, it is impossible for the Defendants to seek to meet the market demand for timber while refusing to even consider offering old-growth timber from the Tongass.[3] Currently, according to the Defendants' own market demand

---

[2] "Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements." *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019). "On the contrary, courts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply." *Id.*

[3] The strategy violated the APA by halting old-growth timber harvesting but notably USDA later sought to prohibit such harvesting through legal processes. *See* Land Management Plan Direction for Old-Growth Forest

*Alaska Forest Ass'n v. USDA*     20
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG     Document 31     Filed 06/24/25     Page 26 of 37

estimates, offering old-growth timber is a necessary condition under the TTRA to supply or seek to supply the market demand for timber.

At bottom, the Defendants have a mandatory duty under the TTRA to seek to provide the market demand for timber from the Tongass National Forest. But by refusing to abide by the 2016 Management Plan and abandoning any pretense of seeking to provide the market demand as explicitly outlined in that plan, they have failed to act on that duty and have failed to act on a discrete agency action they are required to take.[4]

## C. Defendants' motion to dismiss misconstrues Plaintiffs' Complaint, the TTRA, and this Court's precedent.

Defendants first argue that Plaintiffs' "assert that the Forest Service has unlawfully failed to offer sufficient old growth timber for sale." ECF No. 15 at 12. No so. Plaintiffs do not challenge the amount of timber that the Defendants have concluded meets market demand. Plaintiffs allege that by refusing to enforce its own management plan—which outlines the market demand for the

_____

Conditions Across the National Forest System, 88 Fed. Reg. 88,042 (Dec. 20, 2023). These efforts have since been abandoned. U.S. Forest Serv. Memo to Deputy Chiefs, et al. (Jan. 7, 2025), https://forestresources.org/wp-content/uploads/2025/01/national-old-growth-amendment-draft-eis-withdrawal-memo-1-7-25.pdf.

[4] Even if the Defendants' failure to act could be construed as a "delay" in implementing its statutory duty under the TTRA's requirements, it would be inappropriate at this early stage to dismiss Plaintiffs' complaint. As the Ninth Circuit has held, that analysis requires a review of whether the agency's delay is "unreasonable," which is a "fact-intensive inquiry." *Al Otro Lado*, 138 F.4th at 1121.

supply of timber from the Tongass, including old-growth timber as required by the TTRA—the Defendants have violated APA § 706(1). As Plaintiffs have explained in detail, the TTRA requires the Defendants to seek to provide timber that meets market demand. But that is impossible if the Defendants refuse to act on their statutory duty and do not seek to offer sales of timber, including old-growth timber, that would provide the market demand as outlined in the 2016 management plan. By disclaiming any duty to pursue sales that would seek to meet market demand under the 2016 Management Plan, the Defendants have violated the APA.

Imagine if Defendants simply refused to issue a management plan and offered no supply of timber from the Tongass National Forest. There is no difference between that failure to act and promulgating a management plan with, as Defendants claim, no binding requirements. Nor is there a difference between refusing to issue a management plan and simply disclaiming any duty to enforce the management plan's provisions as Defendants have done through the Southeast Alaska Sustainability Strategy. In each case, the Defendants would fail to "seek to provide a supply of timber from the Tongass National Forest" that meets "annual" or "planning cycle" market demand. In turn, in each case, it would have "failed to act" on a mandatory duty under the TTRA. That failure to act allows this Court to "compel agency action" because it is a

discreate action that must be performed under the TTRA, yet has been "withheld or delayed." *See* 5 U.S.C. § 706(1).

Nor do Plaintiffs challenge the "Tongass National Forest's entire program of timber harvest activities" as a broad "programmatic attack." ECF No. 15 at 13. Indeed, *Norton* explained that the "broad programmatic attack" foreclosed by the APA is when a Plaintiff seeks "*wholesale*" "programmatic improvements" "by court decree." 542 U.S. at 64 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 879, 891 (1990)). Here, Plaintiffs do not seek "wholesale" "programmatic improvements" "by court decree." Instead, they challenge the Defendants' failure to implement their statutory (nondiscretionary) duty under the TTRA and their objective refusal to do so by disclaiming its implementation of that duty under the 2016 Management Plan. *See* ECF No. 1 ¶ 40.

*American Forest Resource Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023), a nonprecedential decision from the D.C. Circuit, also does not help Defendants. There, the plaintiffs sought to compel the Forest Service to offer a specific amount of timber each year and argued that the "O & C Act imposes upon the Secretary a non-discretionary duty to sell annually" a specific volume of timber. *Id.* at 796. In rejecting that claim, the court held that the agency's failure to offer "[t]he total timber volume the [agency] offers for sale in a given year" is not a "discrete agency action. Instead, it is a measurement—a

synthesis of multiple sales made over several years." *Id.* at 804–05. But Plaintiffs' claim here is not that Defendants have failed to act by not offering specific volumes of timber within a specific time. Plaintiffs allege that Defendants have failed to act—and have disclaimed the duty to act—by not implementing its nondiscretionary duty under the TTRA. That is a discreate agency action that Defendants are required, but have failed, to take.[5]

## II. Plaintiffs Have Plausibly Alleged That Defendants Violated the APA by Failing to Take Mandatory Actions Under the 2016 Management Plan.

The TTRA places a duty on Defendants to "seek to provide a supply of timber from the Tongass National Forest that (1) meets the annual market demand for timber from such forest and (2) meets the market demand from such forest for each planning cycle." 16 U.S.C. § 539d(a). It is undisputed that the 2016 Management Plan set forth four timber harvest objectives—O-TIM-01, O-TIM-02, O-YG-01, and O-YG-02. *See* ECF No. 15 at 5–6. These objectives specify, in precise terms, not only the annual volume of timber the Defendants

---

[5] Nor do Plaintiffs ask this Court to order the Defendants "how to act." ECF No. 15 at 14. They ask the Court to order the Defendants to comply with the 2016 Management Plan, which they are required to promulgate and enforce to implement the TTRA. ECF No. 1, Prayer for Relief ¶ 3. For similar reasons, Defendants' argument over the "Multiple Use and Sustained Yield Act" are of no moment. *See* ECF No. 15 at 11. Plaintiffs do not challenge Defendants' discretion over how to balance MUSYA's factors with their duty under the TTRA. Defendants did that balancing in the 2016 Management Plan and the substance of the plan is not at issue here.

*Alaska Forest Ass'n v. USDA*                    24
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG    Document 31    Filed 06/24/25    Page 30 of 37

must seek to provide, but also the proportions of old-growth and young-growth timber to meet that volume, alongside an exact 15-year timeline for implementation. *Id*.

The Supreme Court in *Norton* found that agency actions inconsistent with a land use plan "can be set aside as contrary to law pursuant to 5 U.S.C § 706(2)." 542 U.S. at 69. It also suggested that when there is "binding commitment in the terms of [a] plan," agency action can be compelled under 706(1). *Id*.

Under either provision, Defendants have violated the APA. First, Plaintiffs have pleaded that the Defendants have failed to pursue these discrete objectives, including through an illegal revision to the plan and halting required NEPA analyses necessary to effectuate timber sales. ECF No. 1 ¶¶ 27–28; ECF No. 1-2 ¶¶ 6, 10. The 2016 Management Plan's timber objectives represent a discrete implementation decision by the Defendants. In the ROD, Defendants emphasized that the transition of timber objectives must be "implemented in a manner that preserves a viable timber industry." *See* ECF No. 15-2, ROD at 5. These objectives specify precise volumes and types of timber the agency would seek to provide, distinguishing between old growth and young growth to be made available over 15 years. ECF No. 15 at 9–10.

The amendment responded to the Vilsack Memo's directive to "transition timber harvest on the Tongass away from a predominantly old growth timber

harvest to the utilization of young growth timber resources," while maximizing economic returns. ECF No. 15-1 at 369. But more to the point, Defendants explicitly noted that these objectives are what the Secretary considered necessary to be an appropriate volume of timber that "seeks to meet market demand, consistent with TTRA." ECF No. 15-2, ROD at 30. Put differently, the timber volumes outlined in the 2016 Management Plan and ROD are the implementation of the Defendants' duty under the TTRA. By statute, they cannot be hortatory goals with no binding effect. Otherwise, Defendants have not done what the TTRA mandates: "seek to provide a supply of timber from the Tongass National Forest" that meets market demand.

Additionally, as *Norton* explained, limitations of the APA are to protect "agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements." 542 U.S. at 66. No such risk arises here, because the Defendants fully exercised their discretion and policy preferences by adopting these objectives in the 2016 Management Plan (the substance of which are not challenged) leaving only the ministerial duty to faithfully implement them.

Courts have also recognized that management plan terms may be "discreate" agency actions that must be performed. *See, e.g.*, *Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 834 (D. Or. 2022) (holding that BLM must enforce provisions of a management plan because the provision provided

specific details); *Stout v. U.S. Forest Serv.*, 869 F. Supp. 2d 1271, 1279 (D. Or. 2012) (holding that details of a management plan were not so "nebulous as to be unenforceable").

The Ninth Circuit has also recognized that an agency's exercise of some discretion does not preclude an action from being considered "discrete." *See Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068 (9th Cir. 2016). In *Vietnam Veterans*, the court evaluated an Army regulation requiring that former test subjects receive information about health risks related to their exposure. The court recognized that, while the Army has some "discretion in the manner" of fulfilling its duty, this does not exempt it from the obligation to perform a "discrete action" as required under § 706(1), as established in *Norton*. *Id.* at 1079.

Second, even if the Defendants did not make binding commitments in the 2016 Management Plan, they still acted arbitrarily and capriciously by abandoning the objectives through the Southeast Sustainability Strategy. Subsequent case law, after *Norton,* establishes that when an agency changes course, the agency must consider whether the former policy produced notable reliance interests. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020). *See also FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).

Here, Defendants carefully crafted a comprehensive strategy using guidance from the Vilsack Memo to create a plan that would ease the transition from old growth to young growth for the Southeast Alaska timber industry, including Plaintiffs. Defendants also chartered the Tongass Advisory Committee with the explicit goal of developing an "economically viable [plan] for the existing industry." ECF No. 15-1 at 361. And Defendants rejected attempts to shorten the transition timeline to 5 years, stating that a 10–15-year timeline achieved the Vilsack Memo's guidance to "allow the industry to adapt." ECF No. 15-2, ROD at 12. The timber objectives were crafted to ensure "sufficient old-growth timber to meet market demand" and allow the industry to "re-tool." *Id.* at 30.

Given the extensive assurances to the timber industry throughout the 2016 Management Plan, Plaintiffs took them at their word. These assurances were relied upon extensively, leading to key business decisions, planning, and reorganization to transition to a young-growth industry. ECF No. 1 ¶ 48. Given the Defendants' abrupt policy change—and thus "telling [Plaintiffs] one thing and then doing another," *Kentucky v. EPA*, 123 F.4th 447, 452 (6th Cir. 2024)—with no regard for the Plaintiffs' reliance interests, and accepting the facts as true, Plaintiffs have plausibly pleaded a violation of APA § 706(2).

### III. Plaintiffs Have Plausibly Alleged That Defendants Violated the APA by Foreclosing Sales of Old-Growth Timber Under the Tongass Timber Reform Act.

When an agency acts, it must do so within the confines prescribed by Congress. Indeed, "an agency literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (Agencies "have only those powers given to them by Congress"). And "when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 291 (2013). Since at least 2021, Defendants have implemented an ultra vires policy of foreclosing old-growth sales in the Tongass. ECF No. 1 ¶ 53. The TTRA's mandate that the Defendants "seek to provide" the "market demand" for timber requires that old-growth timber be offered until it is no longer part of the market demand for timber. *See* ECF No. 15-2, ROD at 27.

Nor can Congress grant executive branch agencies the power to indefinitely modify or nullify duly enacted law. *Clinton v. City of New York*, 524 U.S. 417, 436–47 (1998). Yet that is what Defendants have done by mandating that no old-growth timber will be offered even when there is market demand for that timber.

This ultra vires action also is an exercise of power with vast economic and political significance. The timber industry, including the market for old-growth

timber, "generates \$288 billion annually (approximately 4 percent of the total U.S. manufacturing GDP)." USDA, Forest Products, https://research.fs.usda.g ov/forestproducts (last visited June 24, 2025). Around "950,000 people are employed in the U.S. forest products industry with a payroll of approximately \$50 billion annually." *Id.*

And whether and when to forbid the harvesting of old-growth timber is a hotly contested political issue that has been controversial for decades. *See, e.g.*, ECF No. 15-2, ROD at 10–11 (recounting contentious history); *see also* Letter from John Boozman, Ranking Member, Senate Comm. on Agric., Nutrition, and Forestry, et al. to Thomas J. Vilsack, Sec'y, USDA (Mar. 20, 2024), https://agriculture.house.gov/uploadedfiles/letter_old.growth.forest.plan.amen dment_03.20.2024.pdf.

To outlaw old-growth timber harvests, the Defendants thus need to "point to 'clear congressional authorization' for the power it claims." *West Virginia*, 597 U.S. at 723 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Without such a clear statement, the agency lacks the authority it claims. *See id.* Not only is there no clear statement for Defendants to enact this policy through the Southeast Alaska Sustainability Strategy, but that policy directly conflicts with the Defendants' duty to "seek to provide" the market demand for timber from the Tongass National Forest. Thus, Defendants' actions are ultra vires and violate APA § 706(2)(C).

*Alaska Forest Ass'n v. USDA*          30
No. 3:25-cv-00046-SLG
Case 3:25-cv-00046-SLG          Document 31          Filed 06/24/25          Page 36 of 37

## CONCLUSION

For the reasons above, the Court should deny Defendants' motion to dismiss.

DATED: June 24, 2025.

Respectfully submitted,

FRANK D. GARRISON
PAIGE E. GILLIARD
SAM RUTZICK
MARK MILLER

/s/ Frank D. Garrison
FRANK D. GARRISON
*Pro Hac Vice Pending*
Ind. Bar No. 34024-49

*Attorneys for Plaintiffs*
*Alaska Forest Association,*
*Viking Lumber, and Alcan Timber*

## CERTIFICATE OF COMPLIANCE

Under Local Rule 7.4(a)(3), I hereby certify that the foregoing brief contains 6,812 words, excluding caption, certification of compliance, and tables of contents and authorities.

/s/ Frank D. Garrison
FRANK D. GARRISON